# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

**PEG LEG PORKER RESTAURANT, LLC,**

    **Plaintiff,**

v.　　　　　　　　　　　　　　　　　　　　　　**Case No. _____**
　　　　　　　　　　　　　　　　　　　　　　　**JURY DEMANDED**

**SOCIETY INSURANCE, a mutual company,**

    **Defendant.**

## COMPLAINT

COMES NOW the Plaintiff, Peg Leg Porker Restaurant, LLC, and for its Complaint against Society Insurance, a mutual company, would state and show as follows:

### PREFACE

"If the crafty conditions, with which [] insurance companies fence in the rights of the assured, and the subtle argument which their counsel found upon them, were always to prevail, these corporations would be reduced almost to the single function of receiving premiums for little or no risk." *Appleton Iron Co. v. British Am. Assur. Co.*, 46 Wis. 23, 1 N.W. 9 (Wis. 1879).

### INTRODUCTION

1. This lawsuit was filed because of Society Insurance's refusal to honor the insurance policy that it sold to Plaintiff, which owns and operates a restaurant in downtown Nashville called Peg Leg Porker. Society Insurance made a promise to Plaintiff to insure certain losses, and it broke that promise when it denied Plaintiff's valid claim.

1

2. To slow the spread and "flatten the curve" of the COVID-19 pandemic, the State of Tennessee and other governmental authorities mandated the closure of Plaintiff's restaurant and hundreds or thousands of other restaurants across the City of Nashville. As a result, Plaintiff suffered a loss of business income.

3. To protect itself against such losses, Plaintiff purchased business interruption insurance from Society Insurance. This insurance was purchased by Plaintiff for the express purpose of insuring Plaintiff against business losses caused by covered events. In this case, Plaintiff's loss is plainly covered by the insurance policy that Society Insurance sold to Plaintiff, which provides coverage to Plaintiff for necessary suspension of operations when the closure of the business is mandated by a governmental order.

4. After Plaintiff's business was ordered to be closed, it did just that. Expecting Society Insurance to pay for its loss of business income and other amounts to which it is entitled, Plaintiff made a claim. Rather than reviewing the insurance policy and properly investigating, Society Insurance did the opposite and denied the claim within three days of submission of the claim. Indeed, internal memorandum circulated by Society Insurance reveals it made the decision to deny claims like Plaintiff's even before Plaintiff submitted its claim.

5. The reasons cited by Society Insurance for denying Plaintiff's claims are baseless, false, and amount to an outright misrepresentation of the contents of the Policy and the law of the State of Tennessee. Plaintiff files this suit to recover what it is rightfully entitled, plus all other amounts to which it may prove itself entitled under the law.

## PARTIES AND JURISDICTION

6. Peg Leg Porker Restaurant, LLC ("Plaintiff") is a Tennessee limited liability company with its principal office located in Nashville, Davidson County, Tennessee. At all times relevant hereto,

Plaintiff owned the commercial buildings located at or around 903 Gleaves Street, Nashville, Davidson County, Tennessee (the "Insured Premises"), at which Plaintiff operated a restaurant.

7. Society Insurance, a mutual company (hereafter "Defendant") is an insurance company conducting business in the State of Tennessee, including Davidson County, Tennessee. Defendant is a corporation formed under the laws of the State of Wisconsin with its principal place of business located at 150 Camelot Drive, Fond du Lac, Wisconsin.

8. Plaintiff owns and operates, among other businesses, a restaurant in Nashville which was forced to suspend its operations due to property loss or damage and recent orders of city, state and federal officials as part of the governmental effort to combat COVID-19 and the spread thereof. This Complaint originates as the result of Defendant's wrongful failure and refusal to promptly and fully pay Plaintiff for its insured losses sustained at the Insured Premises due to damages caused by the COVID-19 global pandemic, governmental mandated shutdown, and/or the interruption to Plaintiff's business operations.

9. Jurisdiction and venue are appropriate in this Court.

## **FACTS**

10. At all times relevant hereto, Plaintiff was an insured policyholder pursuant to an insurance contract bearing Policy Number BP18011156 ("Policy") whereby Defendant agreed to indemnify Plaintiff for losses resulting from direct physical loss of or damage to covered property and the suspension of business at the Insured Premises caused by a covered cause of loss.

11. A copy of the Policy is attached hereto as **Exhibit "A,"** the terms and conditions of which are incorporated herein by reference.

12. The Policy is an "all risk" policy, which means that it provides insurance coverage for all risks of direct physical loss of or damage to covered property unless specifically excluded or limited by the Policy.

13. COVID-19 is a highly contagious airborne virus that has rapidly spread and continues to spread across the United States, infecting more than 600,000 Americans as of the date of the filing of this lawsuit and impacting practically every citizen in our country. COVID-19 has been declared a pandemic by the World Health Organization.

14. The Policy does not contain an exclusion for virus, coronavirus, COVID-19 or governmental actions occasioned thereby. The Policy does not contain any other exclusion that would prohibit coverage for the loss and damage sustained by Plaintiff.

15. Pursuant to the Policy and at all times relevant to this Complaint, Plaintiff paid a premium to Defendant in exchange for insurance coverage as set forth in the Policy.

16. Plaintiff owns and operates a successful barbeque restaurant at the Insured Premises called the *Peg Leg Porker*. There, Plaintiff's staff prepares its food fresh daily in order to create quality dining and an enjoyable experience for its patrons. Plaintiff employs approximately 50 employees, who depend upon Plaintiff for their livelihood.

17. In order to financially protect against property damage and the interruption of business operations, Plaintiff purchased insurance coverage from Defendant. Defendant, in exchange for money in the form of premiums, sold Plaintiff the Policy and promised to protect Plaintiff from property damage and business interruption.

18. In response to COVID-19, federal, state, and local authorities have mandated social distancing, limited gatherings, and mandated the closure of numerous businesses. Plaintiff is one of those businesses.

19. On or about March 22, 2020, while the Policy was in full force and effect, Tennessee Governor Bill Lee issued Executive Order #17 which prohibited patrons from eating and drinking at Tennessee restaurants in an effort to mitigate the impact and spread of COVID-19. ("E.O. #17" attached hereto as **Exhibit "B"**). On or about March 30, 2020, Governor Lee issued Executive Order #21 which extended the effective duration of Executive Order #17 to April 14, 2020. ("E.O. #21" attached hereto as **Exhibit "C"**). On April 13, 2020, Governor Lee issued Executive Order #27, which again extended the duration of Executive Order #17 to April 30, 2020. ("E.O. #27" attached hereto as **Exhibit "D"**). It is anticipated that additional Executive Orders will be entered as well, all of which are incorporated herein by reference when issued.

20. On or around March 15, 2020, while the Policy was in full force and effect, pursuant to a Declaration of Public Health Emergency adopted by the Board of Health for Nashville and Davidson County, the Chief Medical Director for the Metro Public Health Department issued an Order that limited Plaintiff or other restaurants to "half the capacity specified" in its "food service establishment permit" effective March 17, 2020 and on March 20, 2020 that order was amended to prohibit Plaintiff from "allow[ing] customers to consume food or beverage on the premises until further notice," effective that same day. ("Metro Order", as amended, attached hereto as **Exhibit "E"**).

21. On or around March 22, 2020, and effective beginning March 23, 2020, while the Policy was in full force and effect, the Metro Health Department of Nashville/Davidson County issued a "Safer At Home Order" closing all dine-in restaurant operations in an effort to mitigate the impact of COVID-19, to bend the curve and to disrupt the spread of the virus, with the goal of saving lives and reducing strain on local healthcare resources ("Safer At Home Order"). The Safer At Home Order is in effect until April 24, 2020, subject to extension. (Safer At Home Order, as amended,

attached hereto as **Exhibit "F"**). It is anticipated that the Metro Order and Safer At Home Orders will be extended, all of which extensions are incorporated herein by referenced when issued.

22. On or about March 30, 2020, again while the Policy was in full force and effect, Tennessee Governor Bill Lee issued Executive Order #22 which ordered all Tennesseans to stay home unless otherwise engaged in an enumerated essential service/activity to avoid exposure to and the spread of COVID-19. ("E.O. #22" attached hereto as **Exhibit "G"**). E.O. #22 was also extended by E.O.#27 referenced above.

23. On or about March 11, 2020, an individual infected with the COVID-19 virus entered the Insured Premises and occupied the dining room, kitchen, bathroom and business offices of the Insured Premises. Upon information and belief, this patron touched and otherwise made contact with doors, utensils, cooking surfaces, light-switches, bathroom fixtures, furniture and other common restaurant surfaces/items thereby infecting numerous areas of the Insured Premises with the COVID-19 virus and creating a dangerous property condition therein.

24. The events discussed in the paragraphs above (Executive Orders, Metro Orders, Safer At Home Orders and COVID-19 exposure), and others that will follow the filing of this lawsuit, have rendered the Insured Premises untenantable and forced Plaintiff, through no fault of its own, to cease business activities at the Insured Premises on March 20, 2020. This closure has caused substantial loss, damage and interruption to the Insured Premises and Plaintiff's business operation (the "Loss").

25. As a result of the Loss, the Insured Premises has suffered immediate and direct physical loss and/or damage, and Plaintiff has been forced to suspend its operations resulting in substantial business interruption and loss of business revenue.

26. On or about March 20, 2020, Plaintiff promptly reported the Loss to Defendant and Defendant assigned claim number P4065764 thereto (the "Claim").

27. The Policy was in full force and effect at the time of the Loss and the Loss is a compensable claim under the terms of the Policy. As it relates to the Loss, there is no applicable exclusion and Defendant has not asserted or cited Plaintiff to any such applicable exclusion.

28. In addition to providing Plaintiff with coverage for direct physical loss or damage to its property at the Insured Premises, the Policy also provides coverage for, at a minimum:

   a. The actual loss of "Business Income" sustained by Plaintiff" due to the "necessary suspension" of operations during the period of business interruption;

   b. Necessary "Extra Expense" Plaintiff incurs during the period of interruption that it "would not have incurred if there had been no direct physical loss or damage to covered property at the described premises;"

   c. "Civil Authority" action which causes the loss of "Business Income" and "Extra Expense" due to the "action of civil authority that prohibits access" to the Insured Premises; and

   d. "Business Income", "Extra Expense" and "costs to clean and sanitize your premises, machinery and equipment" if operations are suspended due to "contamination that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your products." "Contamination" means "a defect, deficiency, inadequacy or dangerous conditions in your products, merchandise, or premises."

29. "Suspension" is defined by the Policy to include "the partial slowdown or complete cessation of your business activities" or "that a part or all of the described premises is rendered untenantable if coverage for Business Income applies."

30. After the Loss and after reporting the Claim, Plaintiff was prepared to, and in fact did, fulfill all duties imposed upon it by the Policy and undertook reasonable and timely efforts to mitigate its damages.

31. After reporting the Loss to Defendant, Defendant did not contact Plaintiff to conduct any meaningful coverage investigation. In fact, Defendant refused and failed to conduct a reasonable investigation of Plaintiff's claim based on all available information reasonably available to Defendant.

32. Upon information and belief, on March 16, 2020, days before Plaintiff even made the Claim for the Loss, Defendant had predetermined that the Claim would be denied. On that date, the CEO of the Defendant circulated a memorandum to its "agency partners," acknowledging that states like Tennessee had "taken steps to limit operations of certain businesses," and prospectively concluded the Defendant's policies would likely not provide coverage for losses due to a "governmental imposed shutdown due to COVID-19 (coronavirus)." (A copy of Mr. Rick Parks, CEO of Defendant, memorandum is attached as **Exhibit "H"**).

33. Despite the fact that Defendant made no effort to investigate the Claim, Defendant mailed Plaintiff a letter dated March 23, 2020 categorically denying the Claim based upon the conclusory determination that the loss suffered by Plaintiff is "not a covered loss" and that "there is no insurance coverage for this claim." (Denial Letter attached hereto as **Exhibit "I"**).

34. Unlike many commercial property policies, the Policy here does not contain an exclusion for losses resulting from a virus. Indeed, Plaintiff reasonably expected and relied upon the fact that

8

the Policy it purchased from Defendant would provide coverage for property damage and business interruption caused by viruses such as COVID-19.

35. If Defendant intended to exclude damages caused by global viral pandemics, it could have simply and expressly done so in the language of the Policy or by inserting an exclusion. Instead, after having collected significant premium dollars from Plaintiff and being faced with its desire to protect its own financial interest, Defendant now retreats to misinterpretation of the Policy and baseless conclusions to avoid its contractual obligations.

36. Defendant asserts that there is no property damage caused by the presence of a dangerous virus. But, if viruses such as COVID-19 do not cause physical loss or damage to property there would be no reason for the entire insurance industry to develop, and include with a majority of commercial policies in this country, an exclusion entirely dedicated to excluding losses caused by viruses. Contamination by COVID-19 constitutes direct physical loss or damage, a term that is undefined by the Policy.

37. Moreover, here, Defendant ignores the fact that the Policy it drafted provides Plaintiff with coverage for losses due to governmental action "taken in response to dangerous physical conditions," even if those dangerous physical conditions "cause[] damages to property *other than* property at the described premises." (emphasis added). After all, Governor Lee shut down the entire state of Tennessee…because of the dangerous presence of, and infection by, COVID-19. Governor Lee's Executive Orders not only shut down "surrounding" property but *all* property in Tennessee that is not an essential service to avoid exposure to and the spread of COVID-19. "Exposure to" and "spread of" COVID-19 necessarily means that the dangerous condition is actually present and causing damage to properties other that the Insured Premises.

9

Case 3:20-cv-00337   Document 1   Filed 04/20/20   Page 9 of 13 PageID #: 9

38. The continuous presence of COVID-19 on or around the Insured Premises has rendered the same unsafe and unfit for its intended use at this time.

39. Despite the fact that Plaintiff has fulfilled all duties imposed upon it by Defendant and is at no fault in this matter, Defendant has failed to fully and promptly pay Plaintiff's Claim for insurance proceeds.

40. To date, Defendant has failed to fully and properly pay Plaintiff's Claim as required by the Policy.

41. There is no reasonable coverage dispute or other justifiable reason for Defendant's failure to pay Plaintiff's Claim associated with the damage sustained.

42. Defendant's failure to timely and fully pay Plaintiff the amount owed pursuant to the Policy is without justification.

43. Defendant's failure to pay the money and benefits due and owing Plaintiff under the Policy has caused it to initiate this lawsuit to recover the insurance proceeds to which it is entitled.

44. As a direct and proximate cause of Defendant's actions/inactions stated above and below, Plaintiff has sustained substantial compensable losses, including all amounts due Plaintiff under the Policy and other such costs and expenses incurred as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### Count I – Breach of Contract

45. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference, as if set forth verbatim.

46. The Policy is a binding contract and is supported by valid consideration.

47. Defendant is in total, material breach of the Policy, and Defendant is liable to Plaintiff under the Policy for the Loss. Specifically, Defendant breached its contract with Plaintiff by its

failure and refusal to fully and promptly pay the amounts owed to Plaintiff as a result of the Loss as required by the terms of the Policy.

48. As a result of Defendant's breach of contract, Plaintiff has sustained substantial compensable losses for the amounts claimed under the Policy, including but not limited to the direct physical loss or damage to the buildings located on Insured Premises, loss of "Business Income", "Extra Expense", as well as consequential damages, plus interest thereon.

49. Defendant is liable to Plaintiff for its losses.

50. Defendant's breach of contract was intentional, fraudulent, malicious, and/or reckless, therefore justifying an award of punitive damages. *See, e.g., Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. Oct. 31, 2013). Specifically, Defendant intentionally, fraudulently, maliciously, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of Plaintiff's claim when liability was clear; (2) refused and failed to conduct a reasonable investigation of Plaintiff's claim based on all available information; (3) unjustly refused to pay Plaintiff's claim for its own financial preservation with no reasonable or justifiable basis; (4) refused and failed to obtain all reasonably available information and generally ignored Plaintiff's claim; (5) failed to adopt, implement, and enforce reasonable standards for the prompt investigation and settlement of claims arising under its insurance policies; (6) failed to treat Plaintiff's interests equal to that of its own; (7) failed to timely and fully pay all amounts due and owing under the Policy with no reasonable or justifiable basis; (9) misrepresented facts and/or provisions of the Policy relating to coverage of the Loss; (10) engaged in a premature and outcome determinative decision-making process engineered to result in the denial of Plaintiff's Claim even prior to Plaintiff making said Claim; and (11) engaged in such other acts toward Plaintiff that are contrary to the duties owed to Plaintiff as established by the customs and practices in the industry,

the law, and the Policy. Defendant knew, or reasonably should have known, that Plaintiff was justifiably relying on the money and benefits due it under the terms of the Policy. Nevertheless, acting with conscious disregard for Plaintiff's rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Plaintiff, Defendant consciously refused to fully compensate Plaintiff for its losses, and withheld monies and benefits rightfully due Plaintiff. In so acting, Defendant intended to and did injure Plaintiff in order to protect its own financial interest and should be punished. Plaintiff seeks, and is entitled to, punitive damages.

WHEREFORE, as a result of the foregoing, Plaintiff would respectfully request that proper process be issued and served on Defendant requiring it to answer or otherwise respond in the time period allotted by law, and that this Honorable Court award judgment against Defendant as follows:

    A.    For compensatory damages in an amount to be determined by the jury;

    B.    For punitive damages in an amount the jury may find appropriate;

    C.    For all costs incurred by Plaintiff as a result of this action;

    D.    For pre- and post-judgment and interest; and

    E.    For such other further and general relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a jury.

12

Case 3:20-cv-00337   Document 1   Filed 04/20/20   Page 12 of 13 PageID #: 12

Respectfully submitted,

McWHERTER SCOTT & BOBBITT PLC


s/ Jonathan L. Bobbitt
J. BRANDON McWHERTER #21600
brandon@msb.law
JONATHAN L. BOBBITT #23515
jonathan@msb.law
341 Cool Springs Blvd., Suite 230
Franklin, Tennessee 37067
(615) 354-1144

CLINTON H. SCOTT #23008
clint@msb.law
54 Exeter Rd., Suite D
Jackson Tennessee 38305
(731) 664-1340

*ATTORNEYS FOR PLAINTIFF*